**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-6**

MARK ERIC LAWLOR,

Petitioner - Appellant,

v.

DAVID W. ZOOK, Warden,

Respondent - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Mark S. Davis, District Judge. (2:15-cv-00113-MSD-LRL)

Argued: September 25, 2018                   Decided: November 27, 2018

Before MOTZ, DUNCAN, and THACKER, Circuit Judges.

Reversed and remanded by published opinion. Judge Thacker wrote the opinion, in which Judge Motz and Judge Duncan joined.

**ARGUED:** Timothy Patrick Kane, FEDERAL COMMUNITY DEFENDER OFFICE FOR EASTERN DISTRICT OF PENNSYLVANIA, Philadelphia, Pennsylvania, for Appellant. Matthew P. Dullaghan, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** Aren Adjoian, FEDERAL COMMUNITY DEFENDER OFFICE FOR EASTERN DISTRICT OF PENNSYLVANIA, Philadelphia, Pennsylvania; Emily Munn, BISCHOFF MARTINGALE, P.C., Norfolk, Virginia, for Appellant. Mark R. Herring, Attorney

General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

_____

THACKER, Circuit Judge:

A Virginia state court sentenced Mark Eric Lawlor to death after his conviction for the capital murder of Genevieve Orange. In recommending the death sentence, the sentencing jury found that there was a probability Lawlor "would commit criminal acts of violence that would constitute a continuing serious threat to society." Va. Code Ann. § 19.2–264.4.C. Lawlor exhausted state court direct appeal and post-conviction remedies. He then filed the instant federal petition for review of his death sentence pursuant to 28 U.S.C. § 2254, raising 18 claims. The district court dismissed his petition, and Lawlor appealed.

We granted a certificate of appealability on three issues raised in the federal petition, including whether it was constitutional error for the trial court to exclude expert testimony about Lawlor's risk of future violence in prison. Specifically, the state court excluded specialized and relevant testimony of a qualified witness who would have explained that Lawlor "represents a very low risk for committing acts of violence while incarcerated," J.A. 1070,[1] where the jury's only choices were life in prison without parole ("LWOP") or death.

As more fully explained below, we conclude that the state court's exclusion of the expert's testimony was an unreasonable application of clearly established federal law. It is well established that "evidence that the defendant would not pose a danger if spared

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

(but incarcerated) must be considered potentially mitigating," and "such evidence may not be excluded from the sentencer's consideration." *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986). Because we also conclude the state court's error in this regard had a substantial and injurious effect, we reverse the district court's decision and remand with instructions to grant relief.

## I.

### A.

*Factual Background*

In 2008, Lawlor worked as a leasing consultant at an apartment complex in Fairfax County, Virginia, and had access to keys to each apartment. On September 24, 2008, Lawlor consumed alcohol and a large amount of crack cocaine and sexually assaulted, bludgeoned, and killed a tenant in that complex, Genevieve Orange.

> Genevieve Orange[] was found on the floor of the living area of her studio apartment. She was naked from the waist down, her bra and t-shirt had been pushed up over her breasts, and semen was smeared on her abdomen and right thigh. Her soiled and bloodied shorts and underpants had been flung to the floor nearby. She had been struck 47 times with one or more blunt objects.
>
> A bent metal pot was found near Orange's body. Its wooden handle had broken off and was found in the kitchen sink, near a bloody metal frying pan that had been battered out of its original shape. Some of Orange's wounds were consistent with having been struck with the frying pan. Subsequent medical examination established that she had aspirated blood and sustained defensive wounds, together indicating that she had been alive and conscious during some part of the beating.

*Lawlor v. Commonwealth*, 738 S.E.2d 847, 859 (Va. 2013).

4

Lawlor was indicted on March 16, 2009, in Virginia state court on two counts of capital murder: (1) premeditated murder in the commission of, or subsequent to, rape or attempted rape;[2] and (2) premeditated murder in the commission of abduction with the intent to defile.[3]  On the eve of trial, Lawlor admitted "participation" in the murder. *Lawlor*, 738 S.E.2d at 859.  In February 2011, Lawlor was convicted of both counts.  He does not challenge any aspect of the conviction in this appeal.

After Lawlor's conviction at the guilt phase of his trial, the jury proceeded to the penalty phase.  Virginia law provides, "The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that": (1) "there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society" (the "future dangerousness aggravator"); or (2) "that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim" (the "vileness aggravator").  Va. Code Ann. § 19.2–264.4.C.

---

[2] *See* Va. Code Ann. § 18.2–31(5) (capital murder defined as "willful, deliberate, and premeditated killing of any person in the commission of, or subsequent to, rape or attempted rape, forcible sodomy or attempted forcible sodomy or object sexual penetration").

[3] *See* Va. Code Ann. § 18.2–31(1) (capital murder defined as "willful, deliberate, and premeditated killing of any person in the commission of abduction, . . . when such abduction was committed . . . with the intent to defile the victim of such abduction").

The Commonwealth presented evidence of aggravating factors supporting a death sentence. Lawlor then presented his mitigation case, which included around 50 witnesses, in support of a LWOP sentence. He called witnesses who testified about his alcohol and drug abuse; family witnesses; social history witnesses; experts who testified about addiction; and as discussed in depth below, an expert on prison risk assessment and adaptation, Dr. Mark Cunningham.

The jury found that both the vileness aggravator and future dangerousness aggravator were present in Lawlor's case, and it returned a death sentence on each of the two murder counts. Thereafter, the trial court was charged with determining "whether the sentence of death is appropriate and just." Va. Code Ann. § 19.2–264.5. At sentencing on July 1, 2011, the trial court concluded there was "no reason to intercede and sentence [Lawlor] contrary to the recommendations of the jury in either count one or two," and imposed the death sentence. J.A. 1230.

B.

*Expert Witness Testimony*

Arguably the most contentious portion of the penalty phase was during the testimony of retained expert Mark Cunningham, Ph.D., a clinical psychologist and expert in prison risk assessment and adaptation. He evaluated Lawlor by interviewing him, his former probation officer, a friend, and a corrections supervisor; and by reviewing criminal records, prison records, mental health and rehabilitation records, school records, and employment records. Dr. Cunningham used Lawlor's past behavior, as well as

6

statistical data and actuarial models, to analyze Lawlor's "potential to adjust to a life term in prison without serious violence." J.A. 552.

1.

*Dr. Cunningham is Permitted to Testify*

The first issue was whether Dr. Cunningham would be able to testify at all. Defense counsel proffered:

> What he is going to be talking about is, and as set forth in his report, based upon the particular characteristics of Mr. Lawlor, the fact of his prior conduct while incarcerated in jails and prisons in the past, and the lack of write-ups for lack of violence; Mr. Lawlor's age; Mr. Lawlor's having connections with members of the community, and other factors as set forth in the report that, based upon specific factors that relate to Mr. Lawlor that are different than me and that are different than other Defendants.
>
> Based upon all that, Dr. Cunningham will opine that Mr. Lawlor is a low risk to commit serious acts of violence in prison and he can put some numbers on that as set forth in the report; a low risk, a very low risk.
>
> That is peculiar to him. That is unique to him.

J.A. 869–70. The trial court ultimately ruled:

> I don't dispute that what you have said so long as it is particularized to this Defendant and stays with in the guidelines of *Morva* [*v. Commonwealth*, 683 S.E.2d 553 (Va. 2009)], but I think that Dr. Cunningham's report appears to me to be far in excess of that.
> . . .
>
> [T]otal exclusion of Dr. Cunningham would be improper under [*Morva* and *Gray v. Commonwealth*, 645 S.E.2d 448 (Va. 2007)] but it's going to have to be limited under the rules of evidence, in all respects, as well as limited to the particularized facts of this Defendant as set forth; his

7

> character, his prior record and the circumstances of his offense, not prison life and not the effect of prison life.

*Id.* at 872–73.

The Commonwealth objected: "It was mentioned in Counsel's argument about [Lawlor's] risk of future dangerousness in prison society. That's not the question, and the jury is not limited to considering prison society and that's another danger with this type of testimony." J.A. 873. The trial court explained, "The Supreme Court has been very clear; it is the society, it is not the prison society which he is maybe confined to -- it's society, period." *Id.* at 874. Defense counsel then stated, "I would not put [Dr. Cunningham] on to say [Lawlor is not a risk of future dangerousness, period]." *Id.* at 875. The trial court then allowed Dr. Cunningham to take the stand.

2.

*The Trial Court's View of "Society"*

On direct examination, Dr. Cunningham explained his methodology and the materials he reviewed. Defense counsel stated, "[S]pecifically regarding the facts and circumstances of Mr. Lawlor's prior history, and the circumstances of the offense, [I want to turn to] whether Mr. Lawlor would commit criminal acts of violence that would constitute a continuing serious threat to society in the future." J.A. 955. The Commonwealth objected, and the trial court reiterated that society "is not the prison. . . . I think [defense counsel] knows that he can't ask that question, limited to the prison." *Id.* at 957.

8

Defense counsel then asked Dr. Cunningham, "[W]hat is your opinion as to whether Mr. Lawlor would commit criminal acts of violence that would constitute a continuing serious threat to society if he were to be sentenced to life imprisonment rather than to death?" J.A. 960–61. Dr. Cunningham answered, "That likelihood is very low," to which the Commonwealth objected, and the trial court sustained the objection and struck the answer. *Id*. at 962. After several more attempts by defense counsel to elicit testimony about Lawlor's future dangerousness in prison, the trial court said, "[I]t's not limited to prison society, and it's misleading to the jury." *Id*. at 964.

The court repeatedly admonished defense counsel and Dr. Cunningham not to confine "society" to prison. *See, e.g.*, J.A. 979 ("We've already discussed that three times at the bench. The issue is not life in prison. It's an issue of risk of violence, period."); *id*. at 981 ("The issue in this case that you are here to testify about is the likelihood of future violence of Mr. Lawlor. It is not the likelihood of future violence in prison."); *id*. at 995 ("It's future dangerousness, period, not future dangerousness in prison . . . ."); *id*. at 1023 ("The issue is not violence in prison. . . . [I]f [Dr. Cunningham] continues to talk about violence in prison that's not the issue."); *id*. at 1027 ("I have told you over and over the issue is future dangerousness. It's not future dangerousness in prison . . . it's future dangerousness of this individual and you keep trying to back door in the capital sentence . . . .").

The trial court also relied on the Virginia Supreme Court decision of *Porter v. Commonwealth*, 661 S.E.2d 415 (Va. 2008), explaining, "[I]n *Porter*, they . . . said the argument that . . . prison society, what you call prison life, is the only society which

9

should be considered for future dangerousness has been rejected." J.A. 986. As a result of the trial court's belief that Dr. Cunningham could not testify about future dangerousness in prison *only*, Dr. Cunningham was not able to sufficiently explain his prediction that Lawlor would present a very low risk of violence if incarcerated.

3.

*Dr. Cunningham's Other Testimony*

Dr. Cunningham was able to testify about some of the characteristics and history of Lawlor. He stated that there was an instance of Lawlor being "verbally abusive and profane towards jail staff," J.A. 1036, and being the "victim" of two fistfights, for which no disciplinary action was taken, *id.* at 1009. But Dr. Cunningham explained that, overall, Lawlor was not historically violent in a prison setting. He otherwise attempted to discuss risk factors such as age and education, both of which he found to weigh in favor of Lawlor being a low risk for prison violence. However, when Dr. Cunningham attempted to cabin his opinion in terms of "prison," the Commonwealth would object, and the trial court would admonish the expert or defense counsel. Dr. Cunningham eventually told the court it would "violate [his] oath" if he talked about risk of violence *outside* of prison because his "risk assessment is specific to prison," and the trial court responded, "Then you may not be able to testify." *Id.* at 1029–30.

In response to Lawlor's argument on this point, the Commonwealth contends "the jury actually heard the opinions that Lawlor[] [has] asserted in his petition were missing." Resp't's Br. 24 (citing J.A. 966, 967–72). But the passages cited in the Commonwealth's brief do not support this contention. In the first passage, Dr.

10

Cunningham stated, "[T]here is a very low likelihood of serious violence from being in prison," which was vague and not at all particularized to Lawlor. J.A. 966. The other passage cited likewise contains no evidence specific to Lawlor; rather, it is a list of the factors Dr. Cunningham considered in his assessment, ending with yet another objection and bench conference. *See id.* at 967–72. In all, Dr. Cunningham's testimony, riddled with objections and bench conferences, could hardly have given the jury a firm and clear picture of his predictive expert opinion.

4.

*Dr. Cunningham's Proffered Testimony*

Later, defense counsel moved to recall Dr. Cunningham, proffering a list of questions and answers they would have elicited from him, had his earlier testimony not been circumscribed by the trial court:

1. Q: What is your expert opinion as to how Mark Lawlor's behavior pattern while in custody/incarceration, impacts his future prison adaptability?

   A: Because of Mark Lawlor's prior adaption in prison and jail, and particularly because of his lack of violent activity in these settings, Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

2. Q: What is your expert opinion as to how Mark Lawlor's age impacts his future prison adaptability? Does that opinion take into account the fact that Mr. Lawlor committed his current crime at age 43?

   A: Because of Mark Lawlor's age of 45 years old, Mr. Lawlor represents a low likelihood of committing acts of violence while in prison. The fact that Mr. Lawlor

11

committed his current offense at age 43 has been taken into account in forming this opinion, but it does not change my opinion about his future prison adaptability.

3. Q: What is your expert opinion as to how Mark Lawlor's education impacts his future prison adaptability? Is this risk factor predictive of violence in the free community as well?

A: The fact that Mr. Lawlor has earned his G.E.D. is predictive of a low likelihood of committing acts of violence while in prison. This risk factor is far more predictive of violent conduct in the prison context than it is in the free community context.

4. Q: What is your expert opinion as to how Mark Lawlor's employment history impacts his future prison adaptability?

A: Mark Lawlor's employment history in the community is predictive that Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

5. Q: What is your expert opinion as to how Mark Lawlor's continued contact with his family and friends in the community impacts his future prison adaptability?

A: Mark Lawlor's continued contact with these individuals while in prison, is predictive that Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

6. Q: What is your expert opinion as to how Mark Lawlor's past correctional appraisal impacts his future prison adaptability?

A: Mark Lawlor[]'s past correctional appraisal is predictive that Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

12

7.  Q: What is your expert opinion as to how Mark Lawlor's lack of gang affiliation impacts his future prison adaptability?

    A: Mark Lawlor[]'s lack of gang affiliation is predictive that Mr. Lawlor represents a low likelihood of committing acts of violence while in prison.

8.  Q: Have you reached an opinion, to a reasonable degree of psychological certainty, based on all of the factors relevant to your studies of prison risk assessment, as to what Mark Lawlor's risk level is for committing acts of violence while incarcerated? And if so, what is your opinion?

    A: Yes. It is my opinion based on my analysis of all of the relevant risk factors which are specific to Mr. Lawlor's prior history and background, that Mr. Lawlor represents a very low risk for committing acts of violence while incarcerated.

9.  Q: Are all of your opinions concerning the above questions and answers about Mr. Lawlor, grounded in scientific research and peer-reviewed scientific literature?

    A: Yes.

J.A. 1068–70. The trial court rejected this proffer and the request to recall Dr. Cunningham.

5.

*The Jury's Confusion*

During the two days of jury deliberation in the penalty phase, jurors sent notes to the court. First, they asked:

- "Re: Continuing threat to society" – "Society means prison society or society in general?" J.A. 1176.

13

It appears the trial court sent the following answer back to the jury: "Society is not limited to, quote, prison society, but includes all society, prison and general society. Your focus must be on the . . . particular history and background of the Defendant . . . and the circumstances of his offense." J.A. 1177–78. Then the jury asked two more questions:

- "[A]re we to consider . . . 'society in general' . . . is free society of Mark Lawlor as a prisoner in society and outside the wire?" J.A. 1183.

- "If imprisoned for life, what physical constraints would Mark Lawlor be under outside of his cell while exposed to other persons? . . . while exposed to other persons inside prison? [O]utside prison?" J.A. 1183.

The court responded:

- "[S]ociety means all of society. All of society includes prison society as well as non-prison, i.e., all society; [and] the relevant inquiry is not whether Mr. Lawlor *could* commit future criminal acts of violence, but *would* he commit future acts of violence that pose a serious threat to society" J.A. 1188 (emphases supplied).

- "The circumstances of Mr. Lawlor, once he is delivered to the Department of Corrections, is not a matter with which you should concern yourself." J.A. 1199.

One juror later explained in an affidavit:

> I believe [Lawlor] would be a continuing threat if out in regular society, and that is why I voted for a death sentence for [Lawlor]. I do not believe that [Lawlor] would be a continuing threat in prison while serving a sentence of life without parole, but it was my understanding from the judge's instructions that this was irrelevant to the sentencing decision.

J.A. 1223.

14

## C.

### *Post-Sentencing Procedural History*

#### 1.

### *State Court*

Lawlor appealed to the Supreme Court of Virginia, which affirmed the convictions and death sentence. *See Lawlor v. Commonwealth*, 738 S.E.2d 847 (Va. 2013) (hereinafter "*Lawlor I*"). The court upheld the trial court's rulings regarding Dr. Cunningham, explaining that, as used to rebut the future dangerousness aggravator, "evidence concerning [Lawlor's] probability of committing future violent acts, *limited to the penal environment*, is not relevant." *Id*. at 883 (emphasis supplied) (citing *Lovitt v. Commonwealth*, 537 S.E.2d 866 (Va. 2000)).

And as used for mitigation, the state supreme court explained, "[g]eneral conditions of prison life . . . are inadmissible as mitigating evidence." *Lawlor I*, 738 S.E.2d at 883. It then cited the proper controlling Supreme Court law, explaining, "The sentencer must not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," and "future adaptability evidence is relevant character evidence." *Id*. (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion)) (alterations omitted) (emphasis in original). The court continued, "In this context, a defendant's probability of committing violence, even when confined within a penal environment, is relevant *as mitigating evidence* of his character and is constitutionally mandated under *Lockett*, provided the evidence establishing that

15

probability arises specifically from his *character* and is sufficiently personalized to him."

*Id.* (second emphasis supplied). But in applying this clearly established law, the state court reasoned:

> [C]haracteristics alone are not character. Merely extracting a set of objective attributes about the defendant and inserting them into a statistical model created by compiling comparable attributes from others, to attempt to predict the probability of the defendant's future behavior based on others' past behavior does not fulfill the requirement that evidence be "peculiar to the defendant's character, history, and background."

*Id.* at 884 (quoting *Morva*, 683 S.E.2d at 565). In the end, the state supreme court held, "[T]he proffered testimony is not probative of Lawlor's 'disposition to make a well-behaved and peaceful adjustment to life in prison.'" *Id.* (quoting *Skipper*, 476 U.S. at 7).

The United States Supreme Court denied certiorari. *See Lawlor v. Virginia*, 134 S. Ct. 427 (2013). On December 16, 2013, Lawlor filed a state habeas petition, which did not raise the expert testimony issue we are dealing with here. The state habeas court dismissed the petition on October 31, 2014. *See Lawlor v. Davis*, 764 S.E.2d 265 (Va. 2014).

2.

*Federal Court*

Lawlor then timely filed a federal habeas petition on June 8, 2015. The district court referred the petition and motion to a federal magistrate judge, and on August 26, 2016, that judge recommended denying the motion and dismissing the petition. On June 15, 2017, the district court adopted the magistrate's recommendation, dismissed the

16

petition with prejudice, and declined to issue a certificate of appealability ("COA"). *See Lawlor v. Zook*, No. 2:15-cv-113, 2017 WL 2603521 (E.D. Va. June 15, 2017) (hereinafter "*Lawlor II*").

As to Lawlor's claim that he was not able to sufficiently rebut the future dangerousness aggravator, the district court first reasoned that Dr. Cunningham "did in fact present a portion of his opinion regarding future dangerousness." *Lawlor II*, 2017 WL 2603521, at *24. It then explained:

> [T]he Supreme Court of Virginia's interpretation of the definition of "society," as defined by Virginia statute, did not lead to an unreasonable application of clearly established Supreme Court precedent. To the contrary, Petitioner points to no Supreme Court case that clearly establishes that it is unconstitutional for a state to interpret a *state created statutory aggravating factor* of "future dangerousness" to focus only on the danger a defendant would pose in the future to society *as a whole*, rather than prison society.

*Id*. (emphases in original).

As to Lawlor's argument that he was prevented from presenting mitigation evidence, the district court explained:

> [T]he issue turns on the critical distinction between the impermissible exclusion of evidence regarding a defendant's *past behavior in jail*, which supports the claim that he "would not pose a danger if spared (but incarcerated)," *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986), from what the Supreme Court of Virginia concluded was the permissible exclusion of evidence that seeks to demonstrate the absence of dangerousness to the prison community *based on statistical models* considering, among other factors, a defendant's age, education, and gang affiliation.

*Lawlor II*, 2017 WL 2603521, at *25 (emphases in original). The district court then

relied on our recent opinion in *Morva v. Zook*, 821 F.3d 517 (4th Cir. 2016), which, according to the district court, classified *Skipper* as a "narrow" decision that is "limited to evidence regarding the defendant's past behavior while incarcerated." *Lawlor II*, 2017 WL 2603521, at *25. Finally, the district court rejected Lawlor's challenge to the state court's characterization of the excluded evidence as "not being based on Lawlor's personal character." *Id*. It explained, "While a reasonable argument can be made that certain factors, such as Lawlor's employment history or ongoing contact with his family, were evidence documenting Lawlor's personal character," there is "also a reasonable argument" that "because Dr. Cunningham sought to testify about these factors only to compare such facts to statistical models categorizing the behavior of *other unrelated inmates*, . . . such factors were merely statistical data points and not facts peculiar to Lawlor's character." *Id*. Thus, the district court found no reversible error.

On August 16, 2017, the district court denied Lawlor's motion to alter or amend the judgment, and Lawlor timely noted this appeal and filed a motion for COA. We granted the motion for COA on three issues, including the following:

> Where the parties focused much of their penalty phase presentation on, and the jury repeatedly asked about, the issue of Mr. Lawlor's future dangerousness, was it constitutional error to exclude proffered expert evidence that Mr. Lawlor, based on his personal background and characteristics, presented a "very low risk" of future violence in prison?

Order, *Lawlor v. Zook*, No. 17–6 (4th Cir. filed Feb. 22, 2018), ECF No. 35.[4] As

---

[4] We also granted the COA on these two issues: "Was it constitutional error to exclude hearsay evidence of Mr. Lawlor's history of childhood sexual abuse, where the (Continued)

explained below, we reverse the district court's decision on this ground and need not reach the other two issues set forth in the COA. Because the error was not harmless, we remand with instructions that the district court grant relief.

## II.

We review the district court's denial of a habeas petition de novo. Our review of the state court decision is constrained, however, by the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Grueninger v. Dir., Virginia Dep't of Corr.*, 813 F.3d 517, 523 (4th Cir. 2016). A federal habeas court may not grant relief on previously adjudicated state court claims unless it concludes that the state court's determination "was contrary to, or involved an unreasonable application of, clearly established Federal law" as set forth by the Supreme Court, § 2254(d)(1), or rested on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). "In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (per curiam) (internal quotation marks omitted). In other words, "a litigant must show that the state court's ruling was so lacking in justification that there was an error well understood and

---

crime was of a sexual nature and the proffered evidence was highly relevant and reliable?" and "Did the trial court violate the Fifth and Sixth Amendments in sentencing Mr. Lawlor to death based in substantial part on his purported failure to express remorse and his counsel's pre-trial strategy to contest guilt?"

comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (alterations and internal quotation marks omitted).

In assessing a state prisoner's habeas claims, we look to "the last reasoned decision of a state court addressing the claim." *Woodfolk v. Maynard*, 857 F.3d 531, 544 (4th Cir. 2017) (internal quotation marks omitted). Thus, we look to *Lawlor I*, the Virginia Supreme Court's decision on direct appeal.

### III.

Lawlor contends, "[C]learly established federal law dictates that Dr. Cunningham's excluded testimony was admissible under both the Eighth and Fourteenth Amendments." Pet'r's Br. 24. Further, Lawlor asserts, "There is a substantial likelihood that Mr. Lawlor would not have been sentenced to death if 'the jury could have drawn favorable inferences from [Dr. Cunningham's] testimony regarding [Mr. Lawlor's] character and his probable future conduct if sentenced to life in prison.'" *Id.* at 25 (quoting *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986)). We agree.

### A.

*The Clearly Established Federal Law*

#### 1.

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court determination is "contrary to" clearly established federal law where it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than

20

[the Supreme Court] has on a set of materially indistinguishable facts." *Id*. at 412–13. A state court "unreasonabl[y] appli[es]" clearly established federal law "if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by th[e] [Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (alterations and internal quotation marks omitted). "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id*. (alterations and internal quotation marks omitted).

2.

Having set forth the standard, we proceed to discuss the clearly established law at issue. The United States Supreme Court has held, "[T]he Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1981) (alteration omitted) (emphasis in original) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion)).

In *Skipper v. South Carolina*, the Supreme Court applied this rule in considering a capital defendant's right to present mitigating evidence regarding future dangerousness when that aggravator is alleged. *See Skipper*, 476 U.S. at 1–4. Ronald Skipper was

21

convicted of capital murder and rape in state court. His capital jury had to decide whether Skipper would receive the death penalty or life in prison. Therefore, Skipper "sought to introduce testimony of two jailers and one regular visitor to the jail to the effect that [Skipper] had made a good adjustment during his time spent in jail." *Id*. at 3 (internal quotation marks omitted). The state trial court, however, concluded that such evidence "would be irrelevant and hence inadmissible" because state law dictated that "whether petitioner can adjust or not adjust [in prison] was not an issue in th[e] case." *Id*. (alteration and internal quotation marks omitted). During closing arguments, the prosecutor argued that Skipper would "likely rape other prisoners" and "pose disciplinary problems" if incarcerated. *Id*. The jury returned the death penalty, and the state supreme court upheld the sentence. *See id*.

The United States Supreme Court reversed, holding that Skipper should have been able to introduce the testimony of the jailers and the regular visitor to the jail. It explained:

> "[T]he sentencer [may] not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering "any relevant mitigating evidence."

*Skipper*, 476 U.S. at 4 (alterations and citations omitted) (emphasis in original) (quoting *Eddings*, 455 U.S. at 110, 114). The Supreme Court called these rules "now well established." *Id*.

22

The *Skipper* Court then concluded that "the exclusion from the sentencing hearing of the testimony petitioner proffered regarding his good behavior during the over seven months he spent in jail awaiting trial" violated Skipper's right to "place before the sentencer relevant evidence in mitigation of punishment." 476 U.S. at 4. It reasoned, "Consideration of a defendant's past conduct *as indicative of his probable future behavior* is an inevitable and not undesirable element of criminal sentencing: 'any sentencing authority *must predict* a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.'" *Id*. at 5 (emphases supplied) (quoting *Jurek v. Texas*, 428 U.S. 262, 275 (1976)). Thus, "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *Id*. Indeed, the Court reasoned that it would contravene *Eddings* to "preclud[e] the defendant from introducing otherwise admissible evidence for the explicit purpose of convincing the jury that he should be spared the death penalty because he would pose no undue danger to his jailers or fellow prisoners and could lead a useful life behind bars if sentenced to life imprisonment." *Id*. at 7; *see Simmons v. South Carolina,* 512 U.S. 154, 171 (1994) ("An instruction directing the jury not to consider the defendant's likely conduct in prison would not have satisfied due process in *Skipper v. South Carolina*." (citation omitted)); *Boyde v. California*, 494 U.S. 370, 382 n.5 (1990) ("In *Skipper*, we held that a capital defendant must be permitted to introduce in mitigation evidence of postcrime good prison behavior to show that he would not pose a danger to the prison community if sentenced to life imprisonment rather than death."). Therefore, *Eddings*, *Lockett*, and *Skipper* together stand for the proposition that a

23

defendant must be permitted to introduce evidence of past good behavior in prison to aid the sentencing body in predicting probable future behavior and conduct, where that defendant may be "spared (but incarcerated)." *Skipper*, 476 U.S. at 5.

It is likewise clearly established that the sentencing body should be presented with all possible relevant information to enable it to make a prediction about a defendant's probable conduct in prison. The Supreme Court, in considering the constitutionality of Texas's capital sentencing statute that contained a future dangerousness aggravator materially indistinguishable from Virginia's, has recognized that "[i]t is . . . not easy to predict future behavior." *Jurek*, 428 U.S. at 274 (opinion of Stewart, Powell, Stevens, J.J.). Nonetheless, "[t]he fact that such a determination is difficult . . . does not mean that it cannot be made." *Id*. at 274–75. Indeed, "prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system." *Id*. at 275; *see Estelle v. Smith*, 451 U.S. 454, 473 (1981) (quoting this passage with approval). "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *California v. Ramos,* 463 U.S. 992, 1003 (1983) (quoting *Jurek*, 428 U.S. at 276).

Finally, it is well established that expert testimony regarding probable conduct in prison is not per se inadmissible. The Supreme Court has "reject[ed] the contention that expert testimony on future dangerousness should be excluded from capital trials," explaining, "the rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of cross-examination and contrary evidence by

24

the opposing party." *Payne v. Tennessee*, 501 U.S. 808, 823 (1991) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 898 (1983)).

B.

*The State Court Decision*

The Supreme Court of Virginia did not ignore these precepts. To the contrary, it identified some of them. *See Lawlor I*, 738 S.E.2d at 883 (recognizing that "future adaptability evidence is relevant character evidence," and "a defendant's probability of committing violence, even when confined within a penal environment, is relevant *as mitigating evidence* of his character," provided that the evidence "is sufficiently particularized to [the defendant]" (emphasis in original) (citing *Lockett*, 438 U.S. at 604) (plurality opinion)). However, the state court rejected Lawlor's appeal on three grounds: (1) Irrelevance of Prison Society: "[E]vidence concerning a defendant's probability of committing future acts, *limited to the penal environment*, is not relevant to consideration of the future dangerousness aggravat[or]," *id.* (emphasis supplied); (2) Inadmissibility of Prison Conditions: "Evidence of general prison conditions . . . may properly be excluded even as mitigating evidence," *id.* (citing *Lockett*, 438 U.S. at 605 n.12); and (3) Inadmissibility of Characteristics, Not Character: because "characteristics alone are not character," and "evidence [must] be 'peculiar to the defendant's character, history, and background,'" the proffered testimony of Dr. Cunningham was "not probative of Lawlor's 'disposition to make a well-behaved and peaceful adjustment to life in prison,'" *id.* at 884–85 (quoting *Skipper*, 476 U.S. at 7; *Morva*, 683 S.E.2d at 565.).

25

We explain in turn how none of the above rationales removes Lawlor's case from the control of the Supreme Court's clearly established law set forth in *Skipper*, *Eddings*, *Lockett*, and *Jurek*. In fact, these rationales are contrary to both state law and clearly established Supreme Court law.

1.

*Irrelevance of Prison Society*

In upholding Lawlor's death sentence, the Virginia Supreme Court found no fault with the exclusion of Dr. Cunningham's testimony predicting Lawlor's future conduct in prison because "evidence concerning a defendant's probability of committing future acts, *limited to the penal environment*, is not relevant" to consideration of the future dangerousness aggravator. *Lawlor I*, 738 S.E.2d at 883 (emphasis supplied). To prove the future dangerousness aggravator in Virginia state court, the Commonwealth must demonstrate that "there is a probability based upon evidence of the prior history of the defendant . . . that he would commit criminal acts of violence that would constitute a continuing serious threat *to society*." Va. Code Ann. § 19.2–264.4.C (emphasis supplied). And it is true that Virginia courts have "rejected the argument that a jury's determination [on this factor] is restricted to a consideration of *only* the prison society." *Burns v. Com.*, 541 S.E.2d 872, 893 (Va. 2001) (emphasis supplied).

Crucially, however, in this case Lawlor conceded that he would be a future danger in society outside of prison, *see* J.A. 1142–43 (defense closing argument: "[T]here is no denying that when [Lawlor] is on drugs and alcohol and he is in the free community he is a danger to others[.]"), and the jury was able to consider that concession along with any

26

evidence of dangerousness in prison. Furthermore, the jury had only two options: LWOP or death, *see* Va. Code Ann. § 19.2–264.4.A. Therefore, the only issue the jury had to consider was whether Lawlor would also be a future danger to prison society, which is precisely why defense counsel sought to admit Dr. Cunningham's testimony.

In this context, deeming predictive evidence of Lawlor's risk of violence in prison society irrelevant to the sentencer's consideration, and then excluding such evidence completely, contravenes clearly established Supreme Court law because it could prove or disprove a fact the jury could deem to have mitigating value, that is, whether Lawlor would "pose a danger if spared (but incarcerated)." *Skipper*, 476 U.S. at 5. The "relevance standard applicable to mitigating evidence in capital cases" is a "low threshold." *Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004) (citing *McKoy v. North Carolina*, 494 U.S. 433, 440–441 (1990)). "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Id*. at 284 (quoting *McKoy*, 494 U.S. at 440); *see also Payne*, 501 U.S. at 822 ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death." (quoting *Eddings*, 455 U.S. at 114)).

In any event, contrary to the trial court's belief, Virginia courts have *not* held that evidence of prison dangerousness, particularized to the defendant, is irrelevant to a consideration of "society as a whole." Nor could it, without running headlong into *Skipper* and other Supreme Court decisions. *See, e.g.*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 251 n.13 (2007) ("*Lockett* . . . established that a State may not prevent the

27

capital sentencing authority from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation. We reaffirmed this conclusion in *Eddings* . . . ." (citations, emphasis, and internal quotation marks omitted)).

In fact, both parties have now come to a meeting of the minds on this issue. Defense counsel has argued throughout these proceedings that evidence of future dangerousness in prison is *part of* the society inquiry, but nonetheless, "society" cannot be limited to prison life only. *See* J.A. 982 ("[I]t's risk of future dangerousness . . . not just in prison. It's risk of future dangerousness in society, and society includes *more than* prison." (emphasis supplied)). And at oral argument, counsel for the Commonwealth ultimately conceded that prison society is a relevant part of the "society" mentioned in Va. Code Ann. § 19.2–264.4.C. *See* Oral Arg. at 23:55–24:10, *Lawlor v. Zook*, No. 17–6 (4th Cir. Sept. 25, 2018) (agreeing that "part of future dangerousness is dangerousness in prison"); *see also id*. at 38:15–35 (acknowledging that "future dangerousness in society and in prison both are relevant"). The trial court, however, effectively held that evidence of Lawlor's dangerousness in prison was per se irrelevant.

At base, the Virginia Supreme Court has held, "To be admissible, evidence relating to a prison environment must connect the specific characteristics of the particular defendant to his future adaptability in the prison environment," and that is precisely what Dr. Cunningham sought to do here. *Morva v. Commonwealth*, 683 S.E.2d 553, 565 (Va. 2009). Because the state court misconstrued Virginia law and contravened clearly

28

established federal law, the Commonwealth cannot escape *Skipper*'s directive by relying on its erroneous classification of "society."

2.

*Inadmissibility of Prison Conditions*

The red herring infecting all stages of this case is the idea that prisoners may not present evidence of prison conditions or security measures as mitigating evidence in the face of a jury's choice between LWOP and the death penalty. This issue has surfaced in the trial court's rulings, *see, e.g.*, J.A. 985–86; in the trial court's answer to the jury's questions, *see id.* at 1188, 1199 (answering the jury's questions about the scope of "society" with information concerning Lawlor's *ability* to commit acts of dangerousness and the circumstances of his confinement); and it even reemerged in the district court's opinion, *see Lawlor II*, 2017 WL 2603521, at *24 (Lawlor "was denied the opportunity to 'recast' the relevant question to ask whether Lawlor, if at all times confined in a Virginia prison *with its concomitant security conditions*, would likely pose a future danger to *prison society*." (first emphasis supplied)). Even at oral argument, the Commonwealth let this idea creep into the discussion. *See* Oral Arg. at 18:45–19:10 (framing the issue as regarding Lawlor's "prison conditions").

To be sure, under Virginia law, "Conditions of prison life and the security measures utilized in a maximum security facility are not relevant to the future dangerousness inquiry unless such evidence is specific to the defendant on trial and relevant to that specific defendant's ability to adjust to prison life." *Morva*, 683 S.E.2d at 565; *see also Porter v. Commonwealth*, 661 S.E.2d 415, 440 (Va. 2008). But this is

29

simply not applicable in this case. Lawlor has never attempted to introduce generalized evidence of "conditions of prison life" as the Virginia courts have defined them. We therefore reject this rationale in the Virginia Supreme Court's decision.[5]

3.

*Inadmissibility of Characteristics, Not Character*

Finally, the Virginia Supreme Court reasoned that because "characteristics alone are not character," and "evidence [must] be 'peculiar to the defendant's character, history, and background,'" Dr. Cunningham's proffered testimony "[wa]s not probative of Lawlor's 'disposition to make a well-behaved and peaceful adjustment to life in prison." *Lawlor I*, 738 S.E.2d at 884–85 (quoting *Skipper*, 476 U.S. at 7; *Morva*, 683 S.E.2d at 565). The court then concluded that only one proffered question -- "What is

---

[5] This court's § 2254 decisions in *Porter v. Zook*, 898 F.3d 408 (4th Cir. 2018), and *Morva v. Zook*, 821 F.3d 517 (4th Cir. 2016), do not control this issue. For example, in *Porter*, we concluded the state court's determination that Porter's "proffer [of risk assessment testimony] was not individualized or particularized to Appellant [was] not unreasonable." 898 F.3d at 433 (internal quotation marks omitted). There, the petitioner sought to introduce a "statistical projection of how prison restrictions could control an inmate . . . in a likely prison setting." 661 S.E.2d at 440. Indeed, "[a]t no place in the motion [to appoint the risk assessment expert Dr. Cunningham] d[id] [Porter] proffer that Dr. Cunningham's statistical analysis of a projected prison environment will focus on the particular facts of his history and background." *Id.* (alterations and internal quotation marks omitted). Similarly, in *Morva*, we held the state court's determination that Morva failed to "show a particularized need for [his requested risk assessment] expert" did not contravene clearly established law, explaining, "[the state] court's classification of *prison-environment evidence* as irrelevant and therefore inadmissible is not unreasonable under U.S. Supreme Court precedent." 821 F.3d at 526 (emphasis supplied). Such "prison-environment evidence" was "evidence regarding general prison life and security offered to show that Morva's opportunities to commit criminal acts of violence in the future would be severely limited in a maximum security prison." *Id.* at 527 (internal quotation marks omitted).

30

your expert opinion as to how Mark Lawlor's behavior pattern while [previously] in custody/incarceration, impacts his future prison adaptability?" -- "meets the standard for admissibility," and in any event, "that fact was already known to the jury through other evidence." *Id.* at 885. And as to the other questions, "[w]hile each datum is extracted from Lawlor's personal history, it sheds no light on his character." *Id.* This analysis is contrary to clearly established Supreme Court law and finds no home in Virginia law.

First, the state supreme court's distinction between "character" and "characteristics" contravenes Supreme Court decisions discussing the admissibility of mitigation evidence in a capital case. *Jurek*, interpreting a materially indistinguishable future aggravator provision in Texas, held that the statute "authoriz[ed] the defense to bring before the jury at the separate sentencing hearing whatever *mitigating circumstances* relating to the individual defendant can be adduced." 428 U.S. at 276 (emphasis supplied). The Court explained that under that statute, "[i]n determining the likelihood that the defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal record. It could consider the range and severity of his prior criminal conduct. It could further look to the age of the defendant . . . ." *Id.* at 272–73; *see also Smith*, 451 U.S. at 472 ("As to the jury question on future dangerousness, [*Jurek*] emphasized that a defendant is free to present whatever mitigating factors he may be able to show, *e.g.*, the range and severity of his past criminal conduct, his age, and the circumstances surrounding the crime for which he is being sentenced."). Dr. Cunningham's proffer includes not only evidence of prior prison behavior (which even the state court admitted was relevant and admissible under

31

*Skipper*), but also age, educational background, and family connections. Considering the Supreme Court's expansive view of relevancy of mitigating evidence, the state court's restriction thereof is contrary to law.

Second, the distinction between characteristics and character that the Virginia Supreme Court creates does not even comport with state law. It appears to be based on the edict in Virginia law that only evidence "peculiar to the defendant's character, history, and background," can be considered relevant mitigating evidence, *Morva*, 683 S.E.2d at 565, and "statistical projection" that is not "individualized and particularized as to [a defendant's] prior history" is inadmissible, *Porter*, 661 S.E.2d at 440, 442. But Virginia has recognized that evidence "showing [the defendant's] good behavior in jail" that is "peculiar to th[e] defendant's history and background" is relevant under *Skipper*. *Burns*, 541 S.E.2d at 894. It makes no distinction between character and characteristics, but rather, focuses on the particularity of the "history and background" evidence itself.

On this point, the Virginia Supreme Court found that Dr. Cunningham "[m]erely extract[ed] a set of objective attributes about the defendant and insert[ed] them into a statistical model created by compiling comparable attributes from others, to attempt to predict the probability of the defendant's future behavior based on others' past behavior." *Lawlor I*, 738 S.E.2d at 883. But *Morva* and *Porter* do not prohibit this type of testimony; rather, they require that the testimony be tailored to the individual defendant. *See Morva*, 683 S.E.2d at 571 ("With regard to expert prison risk assessments, this Court has not held in our prior decisions that all such expert evidence is *per se* inadmissible. Rather, the Court has taken a case-by-case approach . . . to consider the specific motions

32

for the appointment of a prison risk assessment expert and the proffers of the expert's evidence to determine whether the particular expert would provide evidence sufficiently 'particularized' to the defendant.").

Therefore, the Virginia Supreme Court's decision not only contravenes clearly established federal law, it is not supported by state law.

4.

*Conclusion*

The Supreme Court has long recognized that a capital sentencing body must be permitted to consider any admissible and relevant mitigating information in determining whether to assign the defendant a sentence less than death. Although the Virginia Supreme Court recognized this clearly established law, it attempted to circumvent it by relying on baseless interpretations of state law that themselves contravened longstanding Supreme Court law. "[A] State cannot bar 'the consideration of evidence if the sentencer could reasonably find that it warrants a sentence less than death.'" *Tennard*, 542 U.S. at 285 (quoting *McKoy*, 494 U.S. at 441) (alteration omitted). Once this threshold is met, "the Eighth Amendment *requires* that the jury be able to consider and give effect to a capital defendant's mitigating evidence." *Id.* (internal quotation marks omitted) (emphasis supplied).[6]

---

[6] Because we conclude that the state court unreasonably applied clearly established federal law in excluding relevant *mitigation* evidence at Lawlor's trial, we need not reach the issue of whether Dr. Cunningham's testimony was improperly excluded *rebuttal* evidence challenging the future dangerousness factor.

C.

*The District Court Decision*

The district court erred in its analysis for many of the reasons mentioned above. In addition, however, the district court mischaracterized the Supreme Court's *Skipper* decision. The district court explained that our *Morva* decision confined *Skipper* to "evidence regarding the defendant's past behavior while incarcerated." *Lawlor II*, 2017 WL 2603521, at \*25. This is an erroneous reading of *Skipper* and *Morva*. *Skipper* not only discussed the prisoner's past conduct, but also explained that "evidence of *probable future conduct* in prison as a factor in aggravation or mitigation of an offense" is relevant in capital mitigation cases. *Skipper*, 476 U.S. at 5 n.1 (emphasis supplied). And *Morva*, although it characterized *Skipper* as narrow, simply did not confine it in the manner the district court sets forth.

For these reasons, and those noted above, the district court erred in concluding that the state court did not unreasonably apply clearly established federal law.

D.

*Substantial and Injurious Effect*

Even though we conclude the state court's adjudication was an unreasonable application of clearly established federal law, "our inquiry is not over." *Barnes v. Joyner*, 751 F.3d 229, 239 (4th Cir. 2014). "[W]e are not permitted to grant habeas relief unless we are convinced that the error had a substantial and injurious effect or influence in determining the jury's verdict," which means that we "must conclude that the state court's constitutional error actually prejudiced the habeas petitioner." *Id.* (internal

34

quotation marks omitted). "[I]f the federal court is 'in grave doubt' about whether the trial error had a 'substantial and injurious effect or influence' on the verdict and therefore finds itself 'in virtual equipoise' about the issue, the error is not harmless." *Cooper v. Taylor*, 103 F.3d 366, 370 (4th Cir. 1996) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). We must make this determination "based on [our] review of the record . . . as a whole." *Id*.

During the penalty phase of the trial, the evidence presented revealed that Lawlor could be helpful, kind, and considerate when he was not under the influence of drugs or alcohol. And the trial court's error prevented the jury from hearing Dr. Cunningham predict that Lawlor, based on his history and characteristics, would be a very low risk for violence in a prison setting, where he would not have access to alcohol and drugs. It was clear the jury struggled with how to characterize "society," as they asked the court whether society meant "prison society or society in general"; whether they could consider "society" as "free society of Mark Lawlor as a prisoner . . . and outside the wire"; and "if imprisoned for life, what physical constraints [Lawlor] would . . . be under outside of his cell [and] outside prison." J.A. 1176, 1183. The trial court's answers were that the jury should not consider whether Lawlor "*could* commit future criminal acts of violence," but rather, "whether [he] *would*," and "the circumstances of Mr. Lawlor, once he is [in prison] is not a matter with which you should concern yourself." *Id*. at 1188, 1199 (emphases supplied).

But these answers did not go far enough to alleviate the prior errors made in the trial court's statements at the penalty phase that prison, as part of society, is not relevant.

35

*See Shafer v. South Carolina*, 532 U.S. 36, 53 (2001) (finding that a jury's questions "left no doubt about its failure to gain . . . any clear understanding" of the disputed issue); *see also Tuggle v. Netherland*, 516 U.S. 10, 13–14 (1995) (per curiam) (finding an error that "prevented petitioner from developing his own psychiatric [future dangerousness] evidence to rebut the Commonwealth's evidence and to enhance his defense in mitigation" may well have "affected the jury's ultimate decision, based on all of the evidence before it, to sentence petitioner to death rather than life imprisonment"). And although we cannot properly consider a juror affidavit to impeach a jury's verdict, *see Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002), the affidavit stating that a juror did not "believe that [Lawlor] would be a continuing threat in prison while serving a [LWOP] sentence," but also believed "that this was irrelevant to the sentencing decision," J.A. 1223, is evidence of confusion that resulted from the trial court's explanation of the scope of society.

The trial court's exclusion of Dr. Cunningham's evidence, constant declaration that society in prison is irrelevant, and failure to fully and correctly answer the jury's questions, leaves this court with "grave doubt" that the error was harmless. *Cooper*, 103 F.3d at 370. Therefore, granting relief is appropriate in this case.

IV.

For the foregoing reasons, we reverse the district court's decision and remand for proceedings consistent with this opinion. "When the choice is between life and death, th[e] risk [that the death penalty will be imposed in spite of factors which may call for a less severe penalty] is unacceptable and incompatible with the commands of the Eighth

36

and Fourteenth Amendments." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (plurality opinion).

*REVERSED AND REMANDED*